

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

UNITED STATES OF AMERICA,

    -against-

VICTOR CODY AND PATRICIA LOCKETTE,

    Defendants.

------------------------------------------------------------X

05 Cr. 817 (CM)

## DECISION AND ORDER ON DEFENDANTS' MOTIONS TO SUPPRESS

McMahon, J.:

On June 29, 2005, Detectives Vincent Starkey and Marvin Oakley entered Room 129 at a Ramada Inn off Tuckahoe Road in Yonkers, New York. In the room they found a bag containing $50,200 in counterfeit United States currency. The two persons who were admittedly in the hotel room when the police found the counterfeit bills – defendants Victor Cody and Patricia Lockette – are charged in a one-count indictment with possession of counterfeit United States currency, in violation of Title 18, United States Code, Sections 472 and 2. Each of them has challenged as unlawful the police entry into Room 129 and the recovery of the counterfeit currency and other evidence from a duffel bag situated on the bed.

At a hearing on March 16, 2006, the court heard the testimony of Detective Starkey about the events of that day. Neither defendant took the stand, though both have submitted affidavits to the court. The court has also reviewed the post-hearing briefs submitted by the Government and defense counsel.

After careful consideration, I deny Cody's motion to suppress, because he lacks "standing" to challenge either the detectives' entry into the room (regardless of how it happened) or the search of the duffel bag (ownership of which he has never claimed). However, for the reasons stated below, I grant defendant Lockette's motion to suppress.

**Findings of Fact**

Some of the facts concerning this incident are undisputed.

On June 29, 2005, shortly before 9 AM, Det. Starkey, his partner Det. Oakley and two other Yonkers Police Department detectives were getting breakfast at the Dunkin' Donuts on Tuckahoe Road just west of the Sprain Brook Parkway in Yonkers. Starkey recognized another Dunkin Donuts patron to be Victor Cody, whom he had arrested in 2001 in connection with a scam involving the use

of a disguise and a fraud against an elderly lady.

Starkey watched Cody leave the restaurant and drive a black Nissan Ultima to the Ramada Inn, which is located directly across the street from Dunkin Donuts. He wondered what Cody – whom he knew to be from New York City – was doing in Yonkers. (Tr. 124). Acting on a hunch (which is entirely appropriate and often the essence of good police work), he ran the license plate on the Ultima. The car was registered to Cody's wife, Lessie Herring, at an address in the Bronx. Starkey also ran a driver's license and warrant check on Cody; among other things, he confirmed that Cody was on parole and that his parole address was the address at which the car was registered.

Starkey was nonetheless suspicious and went with Oakley to the Ramada Inn, where he engaged in more perfectly acceptable police work. He first watched Cody's parked car for about an hour. When Cody did not return to the car, Starkey called the Detective Division and asked for a photograph of Cody, which was brought to the scene. He also called a friend at New York State Division of Parole, and learned that the terms of Cody's parole prohibited him from leaving the five boroughs of the City of New York.

Starkey and Oakley took the photograph into the hotel and checked with the manager to see whether Cody or his wife were registered as guests. They were not. The Ultima was not registered with the hotel, either.

Starkey then showed the photograph to several hotel employees. A male maintenance man indicated that he had seen Cody in the hotel on one or two occasions – Monday and Wednesday (June 29 was a Wednesday) – and a woman at the front desk, Raven Green, saw Cody in the hotel while Starkey was at another location, to which he had been called. Green told Starkey that Cody had taken a luggage cart to Room 129, which he entered. The two detectives walked to the hallway outside Room 129, where they stood about two feet from the door. They overheard indecipherable conversation.

It is at this point that the parties' accounts diverge. I find all of the above as a matter of undisputed fact.[1]

*Starkey's Version of the Entry and Search*

Cody "emerged" (Starkey's word) from Room 129 to get the luggage cart. (Tr. 19). He encountered the two detectives. Starkey said, "Do you remember me?" Cody responded, "Yeah, I remember you and Detective Bill Maher (Starkey's partner in 2001)." Starkey then said he wanted to ask Cody questions about his parole status. Cody looked around, saw that there were people in the hallway (employees, other guests), and said, "Can we take this inside? I don't want everybody

---

[1] The defendants, who take great pains to paint an unflattering picture of Detective Starkey, would perhaps disagree with my characterization of his investigation as good police work, but that is a conclusion I draw, rather than a matter of fact.

2

to know my business." At that point the three men entered Room 129.

Starkey initially did not recall whether the door closed behind Cody when he went into the hall or remain partly open. On cross examination, Starkey conceded that the only plastic card key for Room 129 that the police found on April 29 was located in a Louis Vuitton purse, not on Cody (Tr. 49), and also agreed with statements by defense counsel that the door, "like all modern hotel doors, do[es] not just stand open when a person leaves, they close, because that's a security device" and "if a person were to emerge into the hallway and not deliberately try to keep the door open, it would close, correct?" (Tr. 45). And he agreed that the door could only be opened with a plastic card key or from the inside. (Tr 50). He therefore concluded, after defense counsel "enlightened me a little bit," that the door must not have closed after Cody walked out of the room.

There is no evidence in the record concerning how far the luggage cart was from the door to Room 129, although Starkey said that Cody "reached" for it. (Tr. 51). The detectives were themselves only two feet from the door. (Tr. 18-9). Starkey does not "know whether Mr. Cody had, you know, propped the door open.....kept his foot against the door to keep it open" when reaching for the luggage cart. However, during the course of the hearing, he came to the "firm belief that he had to have had the door propped open, because it would have shut behind him, and Patricia Lockette did not answer that door." (Tr. 65)

When the three men entered the room, Oakley cased the bathroom (just inside the door) to ensure that no one was there. They proceeded into the bedroom, where Starkey saw a bed, a desk, a chair, and defendant Patricia Lockette, who was seated on the corner of the bed. She got up and took a seat in the chair next to the desk. Oakley obtained identification from her, which indicated that she was from Georgia. In response to questions, Lockette stated that she was on business in New York, and that she was having an affair with Cody.

Starkey also saw luggage – a lot of it. There were two pieces of luggage on the bed and three or four pieces on the floor. The two items on the bed were a grayish Nike backpack and a black leather duffel bag.

According to Starkey, the duffel bag was unzipped and open. Inside the bag, clearly visible to Starkey as he stood in the room, was money in denominations of $100s and $20s, wrapped in money bands and rubber bands; a mannequin head with a gray wig affixed to it, a blue bank night-deposit-style bag; and two pink bag deposit slips.

Starkey asked who owned the duffel. Cody denied owning it. He grabbed the backpack, emptied its contents onto the bed and announced, "See, this is my bag." (Tr. 26, 74). There is no evidence that either detective reached for a gun or otherwise attempted to prevent Cody from opening the duffel bag, although it was not Starkey's usual practice to allow a suspect to open a closed bag, because "there could have been a gun in that bag" (Tr. 107).

Both defendants disclaimed ownership of the black leather duffel. When asked if the

3

contents of the black bag were his, Cody reiterated, "It's not my bag." (Id. ). When asked whose bag it might be, both defendants shrugged their shoulders. Oakley then said, "Well, if it's not your bag, do you mind it we look inside?" Both defendants said, "Go ahead, it's not my bag."

At that point Oakley dumped the contents of the bag onto the bed, revealing – in addition to what he had said was in plain view – several additional items: men's ties; keys on a ring containing a CVS swipe card, a Hallmark swipe card and a Samson gym pass from a gym in Georgia; two checks made out to third parties in large amounts; and numerous New York State lottery slips. (Tr. 29). Closer inspection of the cash revealed that all the 20s had the same serial number and all the 100s had the same serial number. The mannequin had a peel-off moustache attached to it. (Tr. 124).[2]

Unfortunately, no photograph was taken of the bag and its contents prior to the time that Det. Oakley emptied the bag onto the bed. Instead, the police called for a photographer, put the items back into the bag and had a photograph taken after the defendants were arrested. (Gov't Ex. 2). Starkey admitted on direct that the photograph is not "an exact replica" of what the detectives had seen when they entered the room. Starkey thought that the photograph was "close enough" (Tr. 32) and testified that it "approximate[d]" what he saw when he entered the hotel room (Tr. 81).

The photograph shows a bag that is pulled wide open, displaying nearly all of its contents to plain view. This bears no relation whatever to what the court was told by Starkey during the hearing. The Assistant United States Attorney handed Starkey the bag and asked him to open it as far as it had been open when he first saw it on the bed. Starkey opened the bag and the court had the deputy clerk measure the opening at its widest point. It was 10.5 inches, which is far less than the opening shown in the photograph. As far as this court is concerned, the "posed" photograph has no evidentiary value whatever.

Some of the items in the duffel bag were significant to Starkey from his prior dealings with Cody. The bank bag and deposit slips had significance because of the scam Cody had pulled on the elderly lady, one known as the "pigeon drop." To pull it off, Cody gave the victim a bank bag, which he told her contained a large sum of money. She was told she could not open the bag until she gave some good faith money to Cody – which the lady did. Needless to say, the bank bag contained nothing but filler paper. The wig was significant because Cody was wearing a wig when he was arrested in 2001. (Tr. 69).

Starkey turned to Cody and said, "Victor, it looks like you are back in the game." Cody again denied ownership of the bag. Starkey also asked Cody what he was doing outside of New York City, when the terms of his parole required him to stay in the City. (Tr. 89). Asked whether he was playing a lottery scam, Cody replied that the tickets were "legit" and that he had purchased at the BP

---

[2] If I understand Starkey's testimony correctly, that means the contents of two different bags were dumped onto the bed, and possibly commingled.

gas station near the hotel. (Tr. 94; DX D). After giving Starkey access to his police report of the incident, the detective indicated that the lottery tickets Cody claimed to have purchased were found in the duffel, not the backpack (Tr. 100). Since Cody claimed ownership of the tickets, this is inconsistent with Starkey's testimony that Cody denied ownership of the contents of the duffel.

Starkey asked Lockette about the keys. They had a Georgia gym pass on them, and Lockette had already stated that she was from Georgia. Starkey suggested that the bag must belong to her. She denied ownership of both the bag and the keys.

The two detectives radioed for backup. Once other officers responded, Cody and Lockette were cuffed. As a legal matter, Cody and Lockette were clearly under arrest (i.e., they were not free to leave) well prior to that time, although Starkey changed his tune several times about when that moment occurred: from as early as once Starkey first saw the contents of the black duffel bag (Tr. 110) to as late as after Oakley dumped the contents of the duffel onto the bed and Starkey inspected the money and found the duplicated serial numbers. (Tr. 112).

Defendants were advised that they were being arrested for possession of a forged instrument. Cody was also arrested for parole violation (Tr. 35) although his parole officer was not working on April 29 and Starkey did not have any indication that the parole officer wanted him arrested (Tr. 106). A warrant check on Lockette revealed that there were numerous arrest warrants for her in multiple jurisdictions, so she was detained on those as well. Defendants were Mirandized once they arrived at the detectives' office. (Tr. 36-37).

The detectives did not open any other articles of luggage, which were closed except for one suitcase that was unzipped "maybe about twelve inches." That was not enough to permit Starkey to see inside. The detectives collected the rest of the luggage and took it back to headquarters. Eventually, they obtained a warrant and searched the luggage. There was no testimony about the contents of those bags during the hearing. (Tr. 36-37).

*Cody's Version of Events*

Cody submitted two affirmations, one with his motion to suppress and one at the hearing itself. Cody did not take the stand and permit himself to be cross-examined – even though his testimony could not have been used against him at trial, see United States v. Salvucci, 448 U.S. 83, 99 (1980). The court views the affirmations with some skepticism.

In the first affirmation, Cody claimed to be an invited guest of Lockette, with whom he spent time in Room 129 on "at least four occasions" while she was a registered guest there. (1/27/06 Aff. at ¶¶ 2-3). On June 29, the day of his arrest, he arrived at the room at about 8:45 am, spent some time with Lockette inside the room, left with her and spent the day together, returned to the motel with her, and went to get a luggage cart so she could remove her luggage from the room and check out. He reentered the room for a short time, then came out into the hallway, where he was confronted by the officers. His backpack, which he had deposited in the room upon his arrival that

5

morning, remained in the room. (Id, ¶ 5). While he did not spend the night in Room 129, he did go in and out of the room on several occasions over the course of several days. He also ate a meal in the room. (Id., ¶ 6). He denied inviting the officers to enter Room 129, or consenting to their entry. (Id. ¶ 7). The black duffel bag on the bed was closed, not open, when the officers entered the room. (Id. ¶ 8). He was not Mirandized prior to any questioning in Room 129, and was not read his rights until the officers asked him to give a statement, which occurred after his arrival at the Yonkers Police Station. (Id. ¶ 9).

In his supplemental affirmation, Cody averred that, when he left Room 129, the door closed and locked behind him (3/16/06 Aff. at ¶ 2). He further averred that the police asked if anyone was in the room with him. When he said, "Yes, a woman friend of mine," they asked if he was scamming her. He denied it, but they said they wanted to ask her themselves, and so knocked on the door. Lockette opened the door from the inside, and the officers said they wanted to ask her some questions. One of the officers grabbed him by the arm and pushed him into the room. (Id.). Cody also explicitly stated that he and Lockette were engaged in an extramarital affair. (Id., at ¶ 3).

### Lockette's Version of Events

Lockette, too, submitted an affidavit with her motion to suppress. She did not supplement that affidavit with any evidence at the hearing.

Lockette averred that the officers "searched bags" in the room that she described as "my room at the Ramada Inn on Tuckahoe Road in Yonkers, New York (1/17/06 Aff. at ¶ 2). She denied that Cody asked law enforcement agents to enter the hotel room (Id. at ¶ 3), or that she permitted the agents to enter the room or consented to their entry (Id. at ¶ 5). She denied that any of the seized items were in plain view (Id. at ¶ 4) and stated that the bag containing various items of physical evidence was closed when the detectives entered her room, and was opened without the permission or consent of herself or Cody (Id. at ¶ 5).

### Court's Findings of Disputed Fact: Motion to Suppress Evidence

The first open issue regarding Cody is whether he had a reasonable expectation of privacy that gives him a Fourth Amendment-protected interest in Lockette's hotel room. I adhere to my preliminary conclusion that he did not.

In his first affidavit, submitted together with his suppression motion, Cody presents himself as a visitor to the registered guest (Lockette) in Room 129. While Cody testifies that he was in the room on several occasions – in one instance sharing a meal, in another leaving a bag in the room – he does not suggest that he actually stayed in the room as an overnight guest. After reading this affidavit, the Court stated that, "I am not convinced that Cody's status as an intermittent guest of Lockette is enough to give him standing to challenge the search of the room." *See* Decision on Pretrial Motions, 2/28/06. The Court nonetheless deferred final decision on the issue until after the

hearing, to allow Cody to present further evidence on the issue if he wished to do so.[3]

After the direct examination of Detective Starkey, during colloquy regarding the standing issue, the Court reiterated its skepticism, stating, "As of right now, I haven't heard anything that will suggest to me that I am going to find that Mr. Briccetti's client (Cody) has standing. . . . (T. 37). Nonetheless, no additional evidence came in until the end of the hearing, when Cody offered the statement in the supplemental affirmation that he and Lockette were carrying on an extramarital affair in Lockette's hotel room. (*Id.*, at ¶ 3).

The inference to be drawn from Cody's carefully tailored first affirmation is very clear: Room 129 was Lockette's room and he was just a visitor. When it became apparent that the Court was skeptical about Cody's reasonable expectation of privacy in the hotel room, Cody offered "extramarital affair" affirmation. The second affirmation does not change the number of contacts Cody had with Room 129; rather, it attempts to recharacterize the quality of those contacts.

If Cody and Lockette really were having an affair, Cody might have held a subjective belief that his tryst with the occupant of the hotel room was a private matter. However, one's subjective expectation of privacy is not necessarily a reasonable expectation for Fourth Amendment purposes. *See Rakas v. Illinois*, 439 U.S. 128, 156 (1978) (Harlan, J., concurring).

In *Minnesota v. Olson*, 495 U.S. 91 (1990), the Supreme Court held that an overnight guest had a legitimate expectation of privacy in his host's home and thus could challenge the officers' entry into the home. *Minnesota v. Olson*, 495 U.S. at 98. The Court explained its reasoning as follows:

> To hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the everyday expectations of privacy that we all share. Staying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society. We stay in others' homes when we travel to a strange city for business or pleasure, when we visit our parents, children, or more distant relatives out of town, when we are in between jobs or homes, or when we house-sit for a friend. We will all be hosts and we will all be guests many times in our lives. From either perspective, we think that society recognizes that a houseguest has a legitimate expectation of privacy in his host's home. . . . We are at our most

---

[3] The Supreme Court has rejected the use of the "standing" doctrine in favor of an analysis under substantive Fourth Amendment law. *See Minnesota v. Carter*, 525 U.S. 83, 87-88 (1998); *Rakas v. Illinois*, 439 U.S. 128, 139-140 (1978). However, the court finds the word "standing" useful as short-hand when discussing Fourth Amendment issues under the appropriate "reasonable expectation of privacy" analysis. *See, e.g., United States v. Fields*, 113 F.3d 313, 320 (2d Cir.1997) (discussing the defendant's ability to assert his Fourth Amendment rights using "standing" terminology while recognizing the analysis is separate from traditional standing doctrine.). The Government and the defense both use the term in connection with this issue.

vulnerable when we are asleep because we cannot monitor our own safety or the security of our belongings. It is for this reason that, although we may spend all day in public places, when we cannot sleep in our own home we seek out another private place to sleep, whether it be a hotel room, or the home of a friend. Society expects at least as much privacy in these places as in a telephone booth-"a temporarily private place whose momentary occupants' expectations of freedom from intrusion are recognized as reasonable," *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring).

*Minnesota v. Olson*, 495 U.S. at 99.

Six years later, the Second Circuit Court of Appeals ruled that two individuals could have a reasonable expectation of privacy in premises even when he was not a tenant or sublessee of the premises (i.e., he did not have a possessory interest therein) and did not sleep there. *United States v. Fields*, 113 F.3d 313 (1997). The individuals in question, Fields and Crawley, were using a bedroom in someone else's apartment to bag crack cocaine. The Second Circuit concluded that Fields had a "significant connection" to the premises, because (1) he had a key to those premises from the owner; (2) he paid $125 per week for the privilege of using the apartment; (3) he was permitted to be in the apartment even when Warner (the owner) was not; (4) he was permitted to take guests into the apartment; (5) he had visited the premises between 40 and 50 times. As the Second Circuit recognized, contacts of this nature had been held by the Supreme Court to be sufficient to confer a reasonable expectation of privacy. *Rakas v. Illinois*, 439 U.S. 128 (1978) (houseguest who has key and uses premises in host's absence may have legitimate expectation of privacy).

The second individual, Crawley, did not have a key, did not pay anything that could be characterized as rent and visited the apartment solely as Fields' guest. In other words, he had none of the indicia that were significant to the Supreme Court in *Rakas,* and that gave Fields a reasonable expectation of privacy in the apartment. The Circuit nonetheless concluded that Crawley had standing (the Circuit's word), finding that Fields intended to share his privacy with Crawley. The Circuit based its decision on a single phrase from the *Olson* opinion: it held that "*any guest*, in appropriate circumstances, may have a legitimate expectation of privacy when he is there 'with the permission of his host, who is willing to share his house and his privacy with his guest.'" *United States v. Fields*, 113 F.3d at 320-21 (quoting *Minnesota v. Olson*, 495 U.S. at 99) (Emphasis added).

The Second Circuit's extremely broad holding would appear to confer standing to challenge the entry on Cody. He was in the room as Lockette's guest; she had a legitimate expectation of privacy in the hotel room.

However, the following year, the United States Supreme Court handed down an opinion that eliminated any such expansive reading of *Olson*. In *Minnesota v. Carter*, 525 U.S. 83 (1998), the Supreme Court concluded that two defendants who were in an apartment of another solely for the purpose of bagging cocaine did not have a legitimate expectation of privacy in the apartment.

*Carter* is critically important to any analysis of this issue because the facts of *Carter* are virtually indistinguishable from those in *Fields,* but the result is exactly the opposite. In both cases, the police looked into a window and saw two individuals bagging cocaine. In Carter, the individuals were residents of Chicago, not Minneapolis, where the apartment was located; they were not overnight guests in the apartment, although they were in the apartment with the permission of the householder. The Minnesota Supreme Court, like the Second Circuit in *Fields*, ruled that defendants had a legitimate expectation of privacy in the apartment because "society does recognize as valuable the right of property owners or leaseholders to invite persons into the privacy of their homes to conduct a common task, be it legal or illegal activity." *State v. Carter*, 569 N.W.2d 169, 176 (Minn. 1997). The United States Supreme Court reversed. The Court stated that, after *Rakas* and *Olson*, "an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not." *Minnesota v. Carter*, 535 U.S. at 90. The majority in *Carter* emphatically rejected the sort of expansive reading of *Olson* that was the basis of both the Minnesota Supreme Court's ruling in the case before it and the Second Circuit's ruling about Crawley in *Fields*. It expressly rejected Justice Ginsburg's opinion that any person invited by a homeowner or lessee into a home "to share in any common endeavors," also shared in the homeowner's or lessee's Fourth Amendment protection. *Id.* at fn\*, and 106 (Ginsburg, dissent). Indeed, the Supreme Court described the language about staying overnight in another person's home as "the operative language." *Id.* at fn\*

After *Carter,* the Second Circuit's holding about Crawley's purported expectation of privacy in *Fields* no longer appeared to be good law. Overnight guests in a person's home share in their hosts' expectation of privacy. Mere invitees do not. In *Carter* itself, the Court concluded – on facts it characterized as falling somewhere between those two extremes – that the two defendants, whose presence on the premises was analogous to (indeed, indistinguishable from) Crawley's in *Fields*, did not have a legitimate expectation of privacy in the private home (belonging to someone else) that they were using to bag crack. The commercial nature of their activity, the relatively short duration of their stay, and the lack of any previous connection between respondents and the householder led the high court to conclude that the defendants did not have a legitimate expectation of privacy in the home that would allow them to challenge a search under the Fourth Amendment. *Id.* at 91.

The facts of this case, like the facts of *Carter,* fall between *Olson's* overnight houseguest on the one end and the "mere invitee" on the other. Cody was in the hotel room with the permission of Lockette. If defendants are to be believed, they were together on multiple occasions and they were engaged in a sexual affair. Cheating on one's spouse is certainly activity that one wishes and hopes to conduct in private. But the issue is whether Cody had a legitimate expectation of privacy in Lockette's hotel room, not whether they were engaged in activity that any civilized person would hope to keep private.

There is no case precisely on point. In *United States v. Conway*, 854 F. Supp 834, 838 (D.

9

Kan. 1994)[4], a district court case similar to the case at bar, the court held that the defendant, Quincy Conway, lacked standing to object to the search of the motel room where he was arrested. As in this case, Conway was not the registered occupant of the motel room, did not stay in the room overnight and told the officers that the room did not belong to him. Conway did have a key to the room, which was given to him by a friend so that he could enter the room and engage in sexual intercourse with a woman who was not the room's registered guest. *Id.* at 836, 838. The fact that Conway had a key might suggest that he had an expectation of privacy in the room. However, the fact that his sexual partner was not the guest to whom the room was registered (i.e., was not the "householder," when coupled with Conway's lack of any other connection to the room, caused the district court to conclude that he did not have an expectation of privacy. *Id.* at 838.

Here, there is no evidence that Cody had a key to the room, and we know from his first affirmation (as well as from Starkey's conversations with the hotel staff) that he was not registered in the room and did not spend the night there. If Cody is to be believed, he made approximately five or six visits to Lockette's room: two "brief" visits "on two separate days "a few days prior to my arrest" (Cody 1/27/06Aff. at ¶ 3); one visit of about two hours duration on June 28 (Id. at ¶ 4); a subsequent visit for about one hour later that same day (when they shared a meal); a visit at about 8:45 AM on June 29 (when he left his backpack in the room); and one last visit at the end of the day, which was for the purpose of picking up Lockette's luggage. (Id. at ¶ 5). Even if I believed that Cody was a social guest of Lockette's and was having an affair with her in her hotel room, I would conclude that such intermittent contact with her room, with no extended time spent in the room and no overnight stay, was insufficient to give rise on his part to a reasonable expectation of privacy. The issue, again, is an expectation of privacy in the *premises*, not in the *activity* carried on therein. If a homeowner were having an affair with the postal delivery person in his/her own home, this court would not conclude that the delivery person had an expectation of privacy in the house that was cognizable under the Fourth Amendment just because the householder enjoyed the paramour's company for 20 or 30 minutes several times a week. While the social nature of a consensual affair augurs in favor of a finding of privacy, the intermittent and insignificant nature of Cody's relationship to the hotel room augurs equally strongly against such a finding.

As it happens, I believe, as the trier of fact, that the "affair" Cody and Lockette were supposedly having in the hotel room is a convenient fiction invented by Lockette. Lockette told Oakley that she and Cody were having an affair shortly after the detectives entered the hotel room. But Cody never mentioned anything about an affair until Starkey revealed Lockette's statement during his testimony. That Cody failed to mention anything about the affair until Lockette's statement to Oakley became public – when the alleged affair is the only thing that even arguably would give him the all important expectation of privacy he needs to contest the police entry into the room – suggests to me that he was not aware that he was having an affair until the day of the hearing.

---

[4] Although, *Conway* predates the Supreme Court's decision in *Olson* and *Carter*, its similar fact pattern and the reasoning applied by the court in that case is nonetheless helpful for the present analysis.

Then he seized upon it.[5]

Because I do not believe that Cody and Lockette were having an affair, I have no credible basis to conclude, as defendants would have me do, that Cody visited Lockette's room for purely social purposes. This eliminates any reason to conclude that Cody's situation is closer to that of the defendant in *Olson* than the defendant in *Carter*. But even if defendants were sleeping together in the hotel room, the facts of this case do not support a finding of reasonable expectation of privacy.

Cody thus lacks "standing" (in the *Fields* sense) to contest either the entry into the room or the search.

In addition, because he has never claimed ownership of the duffel bag, Cody lacks standing to object to the search of that bag. I do not need to rely on the testimony of Detective Starkey to conclude that Cody lacks standing to challenge the search; rather, I rely on the fact that he has refused to claim ownership of the bag on repeated occasions. So whether I credit Starkey's testimony is irrelevant to the standing analysis. However, I do credit Starkey's testimony that Cody disclaimed ownership of the duffel bag when the detectives asked if it were his.[6]

The fact that the Government found Cody's fingerprints on items found in the bag and, no doubt, will attempt to link him to that bag, does not persuade me to ignore his refusal to claim ownership in the duffel bag. *See United States v. Watson*, 404 F. 3d 163, 166 (2d Cir 2005). Indeed, a district court may not grant a defendant standing to pursue a suppression motion "relying solely on the government's theory of the case," because to do so would amount to "an evisceration of the defendant's burden of proof as established by the Supreme Court." *Watson*, 404 F. 3d at 166; *see also United States v. Singleton*, 987 F.2d 1444, 1449 (9th Cir.1993). Moreover, a person can handle items that are deposited in someone else's bag. Indeed, a person can own items contained in someone else's bag. It may be the case that Cody owned some of the items in the duffel bag. But this does not translate into ownership of the bag itself and he has not claimed any of the items therein.

Therefore, Cody's motion to suppress evidence is denied.

*Findings of Fact: Lockette's Motion to Suppress*

---

[5] That Lockette told Oakley about an affair idea as soon as she encountered the police does not make it true. It could just mean that she is very quick on her feet and knows some law. Lockette has never asserted under oath – even in her affirmation – that she and Cody were having an affair.

[6] I reject any suggestion that the court placed Cody in an untenable position by telling him that I would not allow him to wait and see how I ruled on the entry and search questions before he decided whether or not to claim ownership in the duffel bag.

11

Lockette has standing to contest any unlawful entry into the hotel room, because it was her room, where she was sleeping while away from home. She thus had a legitimate expectation of privacy therein.

Lockette admits that she has no standing to challenge the search of the duffel bag as long as the defendants entered the hotel room lawfully. However, if the detectives did not enter the room lawfully, then Lockette does not need additional standing to obtain suppression of the evidence in the duffel bag. The fact that the detectives were in the room when they had no right to be there would invalidate the search as to her.

I must, therefore, decide which story I credit concerning how the detectives got into Room 129.

The Government and the defendants agree that Detectives Starkey and Oakley first confront Cody in the hallway outside Room 129. Neither side established exactly where the luggage cart was positioned in relation to the door of Room 129. I know, however, that the detectives were only two feet from the door of the room. (Tr. 19). Starkey tells us that he was told by a hotel employee that, "Cody came in, grabbed a luggage cart, and he proceeded down to room 129" (Tr. 18), and that latter when the he and his partner were near to the room (near enough to hear a male and female having a conversation in the room), Cody "emerged into the lobby, the hallway area, to grab the luggage cart." (Tr. 19). Cody's affidavit merely states that he retrieved a luggage cart from the lobby and returned to the room. He does not mention the luggage cart again. He next states that, he then "left the room and was confronted in the hallway by detectives." (Cody Aff ¶ 5). The Court assumes he was retrieving the luggage cart; however, there is a gap in the evidence.

I thus conclude that the cart must have been far enough from the door to require a person to venture into the hall to retrieve it. However, because it is illogical to think that the cart was very far from the room, I do not believe that Cody needed to go very far outside the room to retrieve the cart. Indeed, because no key was found on Cody when he was searched, I believe that he did not have to go very far outside the room at all. He could have gone no further than the longest distance from which he could ensure that the door did not close and lock behind him while he retrieved the cart.

Cody avers that the door closed and locked behind him when he went into the hall. I do not credit that assertion. I believe that, when he emerged from the room, one of two things happened: either the door did not close entirely, or Cody, who was less than two feet from the door (the officers were two feet away) did something to prevent the door from closing behind him while he reached for the cart that he wanted to pull into the room (like prop it open with his foot).

The real question is what happened next. I do not find it credible that defendant, a seasoned veteran of the criminal justice system, would have invited the detectives to enter the room where the tools of his trade were in a bag on the bed. I don't believe everything in Cody's affirmation. And I understand that criminals often do strange and inexplicable, even stupid, things. But I take into account the kind of criminal Cody was. He was a professional confidence man. I simply do not

believe that Cody would have invited the man who was his nemesis – the one person in all the world who would recognize the tools of Cody's trade when he saw them – into a room where those tools were sitting in an open duffel bag, waiting to be viewed. I do not credit Starkey's testimony that Cody invited the officers into the room because he did not want strangers in the hall to be hearing about his business. That simply does not ring true to me.

I also credit Lockette's statement that she did not give anyone permission to enter the room. Indeed, Starkey does not testify that Lockette gave him permission to enter the room. If she had invited the detectives to enter, Sharkey would surely have relied on the permission given by Lockette – the "tenant" of the room – and would not have bothered with any permission allegedly given by Cody.

Therefore, I conclude that the detectives entered the room without anyone's permission – Cody's or Lockette's – and that they did not lawfully gain entry into Room 129.

Accordingly, Lockette's motion to suppress is granted. The Government may not introduce any of the evidence seized from Room 129 against Lockette.

May 11, 2006

_____
Colleen McMahon

13

BY HAND TO:

David V. Harbach, II
Assistant United States Attorney

Vincent Briccetti, Esq.
Briccetti, Calhoun & Lawrence, LLP
81 Main Street, Suite 450
White Plains, New York 10601
Attorney for defendant Victor Cody

Amy Attias
4 North Ledge Loop
Croton-on-Hudson, N.Y. 10520
Attorney for defendant Patricia Lockette